[Cite as *In re S.L.*, 2022-Ohio-2196.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## JEFFERSON COUNTY

IN THE MATTER OF:
S.L.,
AN ABUSED/DEPENDENT CHILD

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 22 JE 0006**

---

Juvenile Appeal from the
Court of Common Pleas-Juvenile Division
of Jefferson County, Ohio
Case No. 2020 DN 00037

**BEFORE:**
Carol Ann Robb, Gene Donofrio, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Christopher P. Lacich*, Roth, Blair, Roberts, Strasfeld & Lodge, 100 East Federal Street, Suite 600, Youngstown, Ohio 44503 for Appellant and

*Atty. Amanda J. Abrams*, Jefferson County Department of Job and Family Services, 125 S. 5th Street, Steubenville, Ohio 43952 for Appellee.

Dated: June 24, 2022

**Robb, J.**

{¶1} Appellant J.S. (the mother) appeals the decision of the Jefferson County Common Pleas Court, Juvenile Division, terminating her parental rights by granting permanent custody of S.L. to Appellee, Jefferson County Department of Job and Family Services (the agency). She contends the decision was not supported by clear and convincing evidence. For the following reasons, the trial court's judgment is affirmed.

STATEMENT OF THE CASE

{¶2} The mother gave birth to S.L. on July 30, 2020. The father was incarcerated at the time of the child's birth after being convicted of domestic violence against the mother. (Tr. 53). The child remained in the hospital for drug withdrawal treatment until August 18, 2020. (Tr. 52, 54, 58). On release, the child was surrendered to the agency under a short-term voluntary care agreement (providing more time to convince relatives to take custody). (Tr. 57-58). The child was immediately placed with foster parents; they kept the child through the date of the final hearing and were interested in adopting the child.

{¶3} Before the last of the three monthly agreements expired, the court granted emergency shelter care to the agency. (11/13/20 J.E.). The agency then filed a complaint alleging the child was abused and dependent and seeking temporary custody. The parents were each provided counsel.

{¶4} On December 29, 2020, the magistrate found the child was abused and dependent after an adjudicatory hearing. The trial court adopted the magistrate's decision. (1/13/21 J.E.). A guardian ad litem's report was filed before the dispositional hearing. The magistrate granted temporary custody to the agency, and the trial court adopted the decision. (1/14/21 Mag. Dec.); (2/1/21 J.E.). The court discussed the case plan and found reasonable efforts toward reunification were being made by the agency.

{¶5} On July 8, 2021, the agency requested an extension of temporary custody. The guardian ad litem's second report was filed before the August 27, 2021 hearing, which referred to the parents' numerous missed visits and continuing drug use. The court granted the six-month extension of temporary custody. (8/31/21 J.E.).

{¶6}    Before a review hearing, the guardian ad litem filed a third report.  The court's resulting entry stated the following:  "The Court advised the mother that all case plan terms need to be fully complied with and that any concerns need to be resolved.  The Court further advised the mother that the Agency is not required to file for a second extension of temporary custody and could file for permanent custody if the case plan is not being followed and that if the case plan is being followed, the agency could request only one further 6 month extension of temporary custody."  With warnings on drug treatment and screens, the court pointed out that time was running out for case plan compliance.  (11/12/21 J.E.).

{¶7}    On January 11, 2022, the agency filed a motion for permanent custody.  The motion recited the history of the case and the parents' various failures to comply with the case plan.  The motion stated permanent custody was required to keep the child from languishing in foster care, reunification was not feasible, and an extension of temporary custody could not be requested in good faith due to the parents' case plan failures, such as continuing to use illicit drugs and non-compliance with drug treatment.  The motion also pointed out the child had been in foster care and in the agency's custody for 17 months by the date of the motion (after reciting the removal and adjudication history).

{¶8}    The motion was heard on February 25, 2022.  The guardian ad litem's fourth report recommended the grant of permanent custody to the agency.  According to the testimony, the child tested positive at birth for benzodiazepine and Subutex (buprenorphine) with the mother subsequently producing a prescription for only the buprenorphine.  The mother reported at the hospital that she took Valium in the days before giving birth and told a caseworker she took Xanax; she never provided  proof of a valid prescription for either product.  (Tr. 52).

{¶9}    After being treated for withdrawal at the hospital, the child suffered some tremors and muscle stiffness.  Early intervention services were initiated.  There was some delay in walking and verbalization.  (Tr. 106).  The caseworker noted the agency's consideration of various relatives or friends for placement of the child.  Several were excluded because they could not pass a background check, and some were unavailable as they voiced having too many other obligations or failed to initiate a motion (as suggested to some relative due to their living out of state).  (Tr. 107-111).

Case No. 22 JE 0006

{¶10} The case plan had a reunification goal and required both parents to be assessed for drug and alcohol treatment and to follow all resulting recommendations. In addition, the mother was to attend mental health counseling. The case plan also required the parents to exercise parenting time at the agency twice a week. (Tr. 60). The agency provided transportation after the parents complained about the city bus route. Even then, they would say the transportation did not arrive while the transportation provider would say no one exited the residence for pick-up. (Tr. 100). At the visits they attended sober, the parents were typically attentive to the child. (Tr. 99, 134).

{¶11} However, the parents' visits were inconsistent. When the father was present, he would often leave after a few minutes. (Tr. 68, 139). The mother's visits were inconsistent for many months and then improved in the summer of 2021. (Tr. 68, 97). Yet, she missed multiple visits in December 2021 (which was not long after the court's warning on case plan compliance and the possibility that the next motion may seek permanent custody instead of another extension of temporary custody). (Tr. 104-105).

{¶12} On several occasions, the parents were under the influence of drugs or alcohol when they appeared for parenting time. Before an August 2020 visit, an ambulance was called for the mother after the father reported she was having a seizure outside of the agency; she would not release medical records regarding the event. Another time, the father said he could not attend the scheduled parenting time because the mother was in the hospital after suffering a stroke; however, the mother was at the agency for parenting time at the time of his call. (Tr. 78-79). At a visit in October 2020, the father was observed with slurred speech and he had difficulty keeping his eyes open; speaking toward a spot on the carpet as if he believed the child was on the floor. At a visit in November 2020, the mother was unstable on her feet and had trouble communicating. At a June 2021 visit, the father was unstable on his feet with slurred speech and said he was under the influence of Xanax. (Tr. 95-97).

{¶13} Eight days before the January 11, 2022 permanent custody motion was filed, the mother displayed delayed reaction times during her parenting time. The caseworker instructed her to proceed to her counseling center for drug testing, but she never went after saying she would. Two weeks before, she had refused another drug test. (Tr. 102-103).

**{¶14}** Five days before the agency filed the permanent custody motion, the mother arrived thirty minutes late for parenting time. In addition, she was under the influence; exhibiting slurred speech, difficulty keeping her eyes open, and trouble remembering her communications with the caseworker that day. The mother refused to go to the counseling center with the caseworker. The father was waiting outside but also appeared to be under the influence. He was "very tearful" with slurred speech. The caseworker testified: "[The mother] was advising that they needed to catch a bus to Steubenville. [The father] was asking why they had to go to Steubenville. I advised both parties that they were in Steubenville." (Tr. 101-102).

**{¶15}** As for drug treatment services, the mother continued counseling at the facility she attended before the child's birth. She went to a different facility for a short time but only limited records were disclosed to the agency. In the spring of 2021, she returned to her former facility, which provided records to the agency. (Tr. 60-61). A counselor at the facility assumed the mother completed intensive outpatient treatment; however, he took over her counseling when she was only being required to attend sessions twice a week. (Tr. 10). The caseworker emphasized the agency did not receive proof of completion of an intensive outpatient program. (Tr. 65-66). Moreover, in the months before the permanent custody motion, the records showed the following attendance by the mother: zero out of eight sessions in August (with five excused); one out of twelve sessions in September (with six excused as she showed she was doing community service for a court); three out of eights session in October; two out of nine sessions in December; and six out of twelve sessions in the beginning of 2022. (Tr. 17-22, 71-73).

**{¶16}** The mother was also to attend weekly visits with the staff doctor for drug screening and medication updating. (Tr. 10, 12). She initially passed drug tests, but the agency noticed the tests were pre-scheduled. Since the mother was appearing before the agency under the influence (and arrested for theft while under the influence), the agency requested the facility begin random testing. (Tr. 64-65). In April 2021, the mother tested positive for methamphetamine, amphetamine, and benzodiazepine in addition to her prescribed buprenorphine (Suboxone). (Tr. 67).

**{¶17}** In the months leading up to the permanent custody motion, there were still issues with the mother's drug screens. In September 2021, she tested negative for her

prescribed buprenorphine, which is considered a failed test. (Tr. 18-21, 71). In December 2021, she tested positive for methamphetamine, amphetamine, and alprazolam metabolite, and her prescribed buprenorphine. (Tr. 73, 182). The report from February 2022 showed the mother tested positive for amphetamine, gabapentin, and benzodiazepine. She also tested positive for her prescribed buprenorphine, and one of the three instances of benzodiazepine was excused by a dentist who prescribed it to calm her for a procedure. (Tr. 23, 40-41, 74).

{¶18} Regarding mental health counseling, the agency received a letter from a counseling facility stating the mother was a patient in July 2021 (since 2019). When the agency asked for more information, the mother said she was no longer a patient there. She mentioned visiting a psychiatrist but did not name him or release records. She regularly claimed she was on prescribed medications but did not list them or provide evidence of this during the 19 months between the child's birth and the permanent custody hearing. (Tr. 74-77, 123). The mother re-started mental health counseling after the agency filed the motion for permanent custody in January 2022. (Tr. 154-156, 191).

{¶19} The father was to attend an intensive outpatient program for drug counseling three times a week. He sporadically attended until he was unsuccessfully discharged for failing to attend after July 30, 2021. (Tr. 28-29, 44-49, 80-83). Before that, the father was testing positive for illicit substances. In April 2021, the father tested positive for benzodiazepine (in addition to his prescribed buprenorphine). That same month, an intoxicated female called 911 about someone being in their house. When the police arrived, the mother and the father reported someone broke in the house, and the father said he chased the person into the shed with a shovel. The door to the shed was locked with no key, and the father would not allow access to the shed. The officers transported the mother and the father to the hospital for their own safety due to their impairment. (Tr. 92-93). The father denied drug use to the hospital but tested positive for amphetamine and benzodiazepine (along with his prescribed buprenorphine). (Tr. 94).

{¶20} In June 2021, the father appeared for counseling while under the influence; he tested positive for cocaine, methamphetamine, amphetamine, and benzodiazapine. (Tr. 45, 80-82). At the end of July 2021, he tested positive for the latter three of these substances plus marijuana. (Tr. 83). In September 2021, the father claimed he was

attending an intensive outpatient program at a new facility but would not sign a release at the agency, claiming he signed one at the facility.  The agency was not granted access to records until two weeks after the agency filed the permanent custody motion.  Just prior to the hearing, the father acknowledged to the caseworker that he only started at the new facility "several weeks ago."  The agency thus had no drug screens for the father from August 2021 through early 2022.

{¶21} In the month of the permanent custody hearing, the father's two drug screens showed marijuana (and his prescribed buprenorphine).  (Tr. 85-87, 137-138).  The father was late for the hearing and left early.  He interrupted the testimony twice.  He smoked a vape pen on video during the zoom hearing.  Even after the court warned this was inappropriate conduct during an official court proceeding, the father thereafter smoked a cigarette on video during the hearing.

{¶22} The mother argued the last available six-month extension of temporary custody should be granted instead of permanent custody, recognizing that this would only last four months from the date of the hearing.  The mother testified about her bonding with the child during visits at the agency.  (Tr. 147-151).  She spoke of her two other children who live with their father (a different father than the one at issue herein).  She did not have court-ordered parenting time with those children; she spent time with them when they visit their grandmother.  (Tr. 173-174).

{¶23} The mother said she suffered the stroke two weeks after the child's birth; she recited some medications her neurologist prescribed.  (Tr. 189-190).  She also said she started counseling a month before the hearing at a facility where she was prescribed unknown medications for "depression, PTSD and ADHD" while acknowledging she was not supposed to be on those types of substances due to her Suboxone prescription.  (Tr. 156, 165, 176).  She suggested she did not understand she was to provide medical releases to the agency.  (Tr. 168).

{¶24} The mother admitted the police were called for a domestic dispute at her house in the month before the hearing; she reasoned, "couples argue."  (Tr. 186-187).  She acknowledged the father's erratic behavior during the hearing.  (Tr. 169-170).  When asked about the father's problems and the issue of him living with her if she obtained sobriety, the mother said, "he needs to go if I can get her home."  (Tr. 169).

**{¶25}** During the summer of 2021, the caseworker had a discussion with the mother about the risks to her progress (and the poor reunification prospects) that exist when she accomplishes a period of sobriety while living with the father when he was not accomplishing the same drug-free state. After that discussion, the parents claimed the father moved in with his brother. However, the caseworker was unable to reach the father at that location and found him at the mother's residence during an unannounced visit in October 2021 (at which time they were very upset that the caseworker did not call first). They acknowledged he was still living with the mother the week before the permanent custody hearing. (Tr. 68-70, 129-130).

**{¶26}** The caseworker pointed out the child was 19 months old at the time of the hearing and thus had no ability to self-protect, but these parents could not maintain sobriety or provide a drug-free environment for the child. (Tr. 125-127, 130). She noted their mixing of substances with their prescribed Suboxone made the situation more potentially harmful. (Tr. 128-129).

**{¶27}** On March 4, 2022, the trial court granted the agency's motion for permanent custody in a judgment containing factual findings and legal conclusions. The mother filed a timely notice of appeal. The briefing schedule for this expedited appeal closed on June 2, 2022, when the time for filing a reply brief expired.

ASSIGNMENT OF ERROR

**{¶28}** The mother's brief sets forth the following assignment of error:

"THE JUVENILE COURT COMMITTED REVERSIBLE ERROR IN GRANTING [THE AGENCY'S] MOTION FOR PERMANENT CUSTODY OF THE MINOR CHILD S.L., FOR THE SAME WAS NOT THE LAST RESORT, AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AND AN ABUSE OF DISCRETION."

**{¶29}** The mother's brief emphasizes the following principles: "A parent's right to raise his or her children is an essential and basic civil right. * * * The termination of parental rights must be the alternative of 'last resort' in protecting the welfare of children." *In re Sims*, 7th Dist. Jefferson No. 02-JE-2, 2002-Ohio-3458, ¶ 22-23. After so stating, we also observed, "the rights and interests of the natural parents are not absolute. * * * The state may terminate the parental rights of the natural parents if the welfare of the child requires it." *Id.* at ¶ 23, citing *In re Cunningham*, 59 Ohio St.2d 100, 105, 391 N.E.2d 1034 (1979).

**{¶30}** The mother alleges the trial court did not proceed under the "last resort" principle because reunification with bonding was ongoing and the situation warranted an additional extension of temporary custody to give her more time to make progress. She claims the substance issues or non-compliance issues could have been repaired over time and permanent custody was not in the child's best interest. The mother also notes the portion of her testimony expressing disappointment in the father's behavior at the hearing and says she is now committed to evicting him so she can reunite with the child. (Tr. 169-171). It is also claimed that parents who are alleged to be addicts cannot be expected to pass every drug screen or attend all required sessions. The mother points out she was working, had issues with transportation, and was juggling a difficult relationship with the father. She concludes the court's decision was not supported by clear and convincing evidence and was thus against the manifest weight of the evidence and an abuse of discretion.

**{¶31}** The agency states the court reasonably found the child could not be placed with either parent within a reasonable period of time as the parents failed to comply with aspects of the case plan relating to drug and alcohol treatment, continued to test positive for various unprescribed substances, and did not consistently or properly visit with the child. The agency emphasizes the reasonable efforts for reunification and points out the child had been in the agency's care for nearly 17 consecutive months when the motion for permanent custody was filed.

**{¶32}** We begin by addressing a statement in the mother's brief claiming the child was not abused or neglected. In response, the agency points to the following holding: "When a newborn child's toxicology screen yields a positive result for an illegal drug due to prenatal maternal drug abuse, the newborn is, for purposes of R.C. 2151.031 (D), *per se* an abused child." *In re Baby Boy Blackshear*, 90 Ohio St.3d 197 (2000), syllabus, citing R.C. 2151.031(D) ("As used in this chapter, an 'abused child' includes any child who * * * Because of the acts of his parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare"). The child tested positive for benzodiazepine (along with Subutex for which the mother produced a valid prescription). In addition, the child was hospitalized for 19 days after birth and

treated for withdrawal symptoms. The child suffered tremors, muscle stiffness, and some delays.

{¶33} Furthermore, the agency points out the court additionally found the child to be dependent. The child was treated for withdrawal symptoms under a situation where there was drug usage by both parents in the home, there were mental health concerns as to the mother, and there existed a lack of safety in such an environment. *See, e.g.,* R.C. 2151.04(C) ("As used in this chapter, 'dependent child' means any child * * * Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship").

{¶34} In any event, at the permanent custody hearing, "[t]he adjudication that the child is an abused, neglected, or dependent child and any dispositional order that has been issued in the case under section 2151.353 of the Revised Code pursuant to the adjudication shall not be readjudicated * * *." R.C. 2151.414(A)(2). The abuse, neglect, or dependency adjudication with a temporary custody disposition is a final appealable order. *In re Murray*, 52 Ohio St.3d 155, 556 N.E.2d 1169 (1990), syllabus. It is jurisdictional that the appeal from such order must be filed within 30 days of the judgment. *In re H.F.*, 120 Ohio St.3d 499, 2008-Ohio-6810, 900 N.E.2d 607, ¶ 17-18. When there is no appeal from such order, an appeal after an award of permanent custody to the agency "is limited to issues that arose after the adjudication order." *Id.* at ¶ 17.

{¶35} We thus move to the permanent custody decision. Pursuant to statute, the court may grant permanent custody of a child to the agency if the court determines by clear and convincing evidence it is in the best interest of the child and any of the following apply: (a) the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents (if the next three choices are inapplicable); (b) the child is abandoned; (c) the child is orphaned and no relatives are able to take permanent custody; (d) the child has been in the agency's temporary custody for 12 or more months of a consecutive 22-month period; or (e) the child has been adjudicated an abused, neglected, or dependent child three separate times. R.C. 2151.414(B)(1)(a)-(e).

{¶36} "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations

Case No. 22 JE 0006

sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). A permanent custody decision is subject to reversal upon a showing of an abuse of discretion. *See In re A.J.*, 148 Ohio St.3d 218, 2016-Ohio-8196, 69 N.E.3d 733, ¶ 27. *See also In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48. An abuse of discretion occurs if the court's decision is unreasonable, arbitrary or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). The appellate court is not free to substitute its judgment for that of the trial court, as decisions on credibility and weight are best made by the fact-finder. *Davis v. Flickinger*, 77 Ohio St.3d 415, 416, 674 N.E.2d 1159 (1997); *Cross*, 161 Ohio St. at 478.

**{¶37}** The mother's brief refers to the "12 of 22" provision in subdivision (d) of R.C. 2151.414 (B)(1) as a requirement. (Apt.Br. at 5). The agency's brief cites this provision as general law but then focuses on the subdivision (a) option. The trial court's judgment made findings and conclusions related to the subdivision (a) option but also observed the child had been in the agency's custody since the voluntary care agreement was executed on August 18, 2020.

**{¶38}** "The statutory findings for granting permanent custody in (a) through (e) of R.C. 2151.414(B)(1) are alternatives so that only one of the five options must be found by the court." *In the Matter of A.L.F.*, 7th Dist. Columbiana No. 18 CO 0024, 2019-Ohio-937, ¶ 39, quoting *In the Matter of A.E.B.*, 7th Dist. Jefferson No. 17 JE 0030, 2018-Ohio-2269, ¶ 29. "[A]n agency need no longer prove that a child cannot be returned to the parents within a reasonable time or should not be returned to the parents, so long as the child has been in the temporary custody of an agency for at least 12 months." *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 21. If the agency relies on the 12 of 22 provision, the criteria must be satisfied as of the date that the agency files the motion for permanent custody on this ground; the agency cannot argue more than 12 months have passed by the time the custody hearing takes place. *Id.* at ¶ 24-26.

**{¶39}** For the 12 of 22 provision, the temporary custody time count is deemed to begin on the earlier of the date the child is adjudicated (as abused, neglected, or dependent) or the date that is 60 days after the removal from the home. R.C.

Case No. 22 JE 0006

2151.414(B)(1)(d). As for the date of adjudication, the magistrate's decision was entered December 29, 2020 and adopted by the court on January 13, 2021 (after no objections were filed). The court did not refer to these dates and may have been concerned the adjudication did not occur until the trial court entered its order so that 12 months had not yet passed by the time of the January 11, 2022 motion for permanent custody. In any event, the statute uses *the earlier* date of adjudication or the date that is 60 days from the removal date. *Id.*

**{¶40}** The child was placed in foster care on August 18, 2020 under a voluntary care agreement. Using 60 days from this date, the child was in temporary custody under R.C. 2151.414(B)(1)(d) for more than 12 consecutive months at the time of the agency's January 11, 2022 motion for permanent custody. Although the agency's motion and the trial court's judgment set forth the facts showing subdivision (d) of R.C. 2151.414(B)(1) applied, neither the agency nor the trial court specifically referred to the 12 of 22 provision. Possibly, the agency believed the removal date was not until the date of the shelter care order on November 13, 2020; 60 days from that date would make the permanent custody motion a day too early for use of the 12 of 22 provision. However, a voluntary agreement for the child's removal and placement in agency-directed foster care would qualify as a removal under R.C. 2151.414(B)(1)(d).

**{¶41}** Regardless, the trial court made specific findings related to subdivision (a) of R.C. 2151.414(B)(1), and the agency's motion alleged reunification was not realistic and explained why it could not in good faith seek a temporary custody extension. The trial court expressly found, "the child cannot be safely placed with either parent within a reasonable period of time * * *." *See* R.C. 2151.414(B)(1)(a). The court emphasized the parents' failure to comply with the case plan, such as by testing positive for illegal substances.

**{¶42}** Pursuant to the statute, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent" if the court determines by clear and convincing evidence:

> (1) Following the placement of the child outside the child's home and
> notwithstanding reasonable case planning and diligent efforts by the agency
> to assist the parents to remedy the problems that initially caused the child

to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

R.C. 2151.414(E)(1).

**{¶43}** On the topic of reasonable efforts, the mother states the agency must prove it made reasonable efforts under R.C. 2151.419(A)(1) (to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home). This statute cites other statutes which are unrelated to permanent custody but apply at the earlier stages; the statute does not directly apply at a permanent custody hearing unless the agency did not already establish reasonable efforts. *In re C.F.*, 113 Ohio St.3d 73 at ¶ 4, 41-43. Nevertheless, if the court relies on R.C. 2151.414(E)(1) in granting permanent custody, then reasonable case planning and diligent efforts by the agency to assist the parents must be established under that division. *Id.* at ¶ 42.

**{¶44}** The trial court previously found the agency engaged in reasonable reunification efforts. For instance, the court made such a finding in granting temporary custody to the agency. (1/14/21 Mag.Dec.); (2/1/21 J.E.). The permanent custody order on appeal herein reiterated the finding that reasonable efforts were made to reunite the child with the parents and to prevent placement outside of the home. The court's permanent custody order also found: "following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by [the agency] to assist the natural parents to remedy the problems that initially caused the child to be placed outside of the natural parent's home, the natural mother and natural father have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home."

**{¶45}** When the court determines this fact by clear and convincing evidence, the court "shall" enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(E)(1). Moreover, such a finding can be based on "[a]ny other factor the court considers relevant." R.C. 2151.414(E)(16) (and "the court shall consider all relevant evidence").[1]

**{¶46}** Considering all of the evidence recited in our Statement of the Case supra, it was not an abuse of discretion to conclude that despite the agency's reasonable case planning and diligent efforts to assist the parents to remedy the conditions that caused the child to be placed outside the home, the parents failed continuously and repeatedly to substantially remedy the conditions. See R.C. 2151.414(E)(1). That is, the trial court properly concluded the child could not be safely placed with the parents within a reasonable time due to their inability to stay drug-free over the year and a half the child had been living in foster care due to their drug use and the child's addiction symptoms at birth. Not only did the parents fail drug screens and miss drug counseling and parenting time during the period of removal, but they also appeared for parenting time while impaired. In fact, just days before the agency filed the permanent custody motion, the mother arrived for a visit with the child while noticeably under the influence. Also, her mental health treatment, which was another aspect of the case plan, was discontinued at a crucial time and earlier care was not timely disclosed.

**{¶47}** In addition to the mother's drug and mental health issues, she was still living with the father, who had his own drug problems and issues with erratic behavior. She was warned about this issue many months before the hearing, when she seemed to be doing better with drug treatment. The parents were thereafter dishonest with the caseworker on the father's residency. The mother testified she would now get serious about evicting the father from the home she owned. However, the trial judge occupied the best opportunity to view the demeanor, gestures, voice inflections, and attitude of the witness to judge their credibility. *Davis*, 77 Ohio St.3d at 418. "[A] reviewing court may not substitute its judgment as to what facts are shown by the evidence for that of the trial

---

[1] A court must also find the child cannot be placed with either parent within a reasonable time or should not be placed with either parent if their chemical dependency is so severe that it makes the parent unable to provide an adequate permanent home for the child within one year. R.C. 2151.414(E)(2).

court" because the "trial judge, having heard the witnesses testify, was in a far better position to evaluate their testimony than a reviewing court." *Cross*, 161 Ohio St. at 478.

**{¶48}** In conclusion, the trial court's holding that the child could not be placed with either of the child's parents within a reasonable time was supported by clear and convincing evidence. We consequently move to the next part of the permanent custody test, the child's best interest.

**{¶49}** In determining best interest of a child on the topic of permanent custody, the court shall consider all relevant factors, including but not limited to, the following: (a) the child's interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, and any other person who may significantly affect the child; (b) the child's wishes expressed by the child or the guardian ad litem; (c) the child's custodial history, including whether the agency had temporary custody for 12 or more months of a consecutive 22-month period; (d) the child's need for a legally secure permanent placement and whether it can be achieved without granting permanent custody to the agency; and (e) the applicability of any of the factors in divisions (E)(7) to (11). R.C. 2151.414(D)(1). We note the court "shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child." R.C. 2151.414(C).

**{¶50}** As for the last statutory factor on the list, the state does not argue (E)(7) through (11) apply. *See* R.C. 2151.414(D)(1)(e). Although the parents appeared for parenting time under the influence at times, the parenting time was supervised at the agency, and the caseworker specifically said the child was not at risk. Moreover, although the mother missed sessions and failed drug tests, she continued drug treatment. *See* R.C. 2151.414(E)(9). In any event, the trial court did not allude to this subdivision in making its detailed findings.

**{¶51}** As for the other best interest factors, the parents visited the child, sometimes inconsistently and sometimes while impaired. The father often left the visits early. The mother testified about her care of and bonding with the child during parenting time at the agency. She discussed her two other children, with whom she did not have court-ordered visitation but whom she saw when they visited with her mother. The trial court discussed the agency's consideration of placement with various relatives, including

the issues with background checks and the lack of ability or desire to care for a child. There was no testimony on visits with these relatives who were initially considered as potential custodians. The trial court additionally pointed to the child's successful integration into the foster parents' home where the child's needs were being met. The foster parents wished to adopt the child. *See* R.C. 2151.414(D)(1)(a).

**{¶52}** The child was too young to express her wishes, but the guardian ad litem recommended the grant of permanent custody to the agency. *See* R.C. 2151.414(D)(1)(b). The trial court considered the child's custodial history; the child was in the agency's care for over 12 months of a consecutive 22-month period. *See* R.C. 2151.414(D)(1)(c). In fact, upon release from the hospital 19 days after birth, the child went directly to the home of the foster parents where she remained through the date of the hearing 18 months later. In other words, the child never lived with the mother or the father. Next, the court reasonably found the child was in need of a legally secure permanent placement which could not be accomplished without granting permanent custody to the agency. *See* 2151.414(D)(1)(d).

**{¶53}** Finally, the statutory list of best interest factors is not exhaustive. *See* R.C. 2151.414(D)(1) ("consider all relevant factors, including, but not limited to"). The chances of achieving or maintaining sobriety are pertinent here as are the risks to the child's safety and emotional well-being. "Where the evidence is in conflict, the trier of facts may determine what should be accepted as the truth and what should be rejected as false." *Cross*, 161 Ohio St. at 478. The court pointed to the parents' failure to comply with the case plan, such as by testing positive for illegal substances. There were issues with consistency of attendance at parenting time and altered states of mind when arriving for parenting time. Other indicators of the parents' unreliability showed in their inconsistent attendance at drug counseling and failure to consistently provide releases. We again refer to our Statement of the Case where we detailed the trial testimony.

**{¶54}** The trial court occupied the best position from which to weigh the evidence and judge the credibility of the witnesses on various topics, including the impairment at visits in the days before the agency filed the motion for permanent custody. See *Davis*, 77 Ohio St.3d at 418-419. Notably, the court watched the mother testify and "there may be much evident in [her] demeanor and attitude that does not translate to the record well."

*See id.* at 419.  We conclude there was clear and convincing evidence to support the decision that granting permanent custody to the agency was in the child's best interest.

{¶55}  For the foregoing, Appellant's assignment of error is overruled, and the trial court's judgment granting permanent custody to the agency is affirmed.


Donofrio, P J., concurs.

D'Apolito, J., concurs.

[Cite as *In re S.L.*, 2022-Ohio-2196.]

_____

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Juvenile Division of the Court of Common Pleas of Jefferson County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**